UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

No. 13 Civ. 4467 (RJS)
_____

PAVOLO VENEZIA,

Plaintiff,

VERSUS

LUXOTICCA RETAIL NORTH AMERICA INC., *et uno*,

Defendants.
_____

OPINION AND ORDER
September 28, 2015
_____

RICHARD J. SULLIVAN, District Judge:

Plaintiff Pavolo Venezia, a New Jersey resident, brings this action against Defendants Luxottica Retail North America Inc. ("LRNA"), a foreign corporation with its principal place of business in Ohio, and Sunglass Hut Trading, LLC, a foreign limited liability company incorporated in Ohio, alleging employment discrimination and various other claims under federal, state, and city law. Now before the Court is Defendants' motion for summary judgment. For the reasons set forth below, Defendants' motion is granted.

I. BACKGROUND

Plaintiff is a 45-year-old white male who worked as a Store Manager and as a Senior Store Manager at a Sunglass Hut store located in the SoHo area of New York City (the "SoHo Store") from 1996 until his termination in October 2012. (Doc. No. 1 ("Complaint" or "Compl."), ¶¶ 10–11, 41.) On June 27, 2013, Plaintiff filed the complaint in this action, alleging sixteen separate causes of action for unlawful discrimination, retaliation, and hostile work environment based on race, religion, and age, in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*) ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), the Age Discrimination in Employment Act (29 U.S.C. § 621 *et seq.*) ("ADEA"), the New York State Human Rights Law (N.Y. Exec. L. § 296 *et seq.*) ("NYSHRL"), and the New York City Human Rights Law (N.Y.C. Admin. Code § 8–107 *et seq.*) ("NYCHRL"), unlawful conduct under the Family and Medical Leave Act (29 U.S.C. § 2601 *et seq.*) ("FMLA"), intentional infliction of

emotional distress, negligent hiring, and breach of an implied contract for the designing of sunglasses. In essence, Plaintiff alleges that he was discriminated against, retaliated against, and subjected to a hostile work environment because of his failure to hire "young, beautiful, white people," as allegedly requested by Debbie Gidiuli, one of the Regional Managers of the SoHo Store. (Compl. ¶¶ 30, 42.) He also alleges that he was terminated because of his request not to work on Sundays for unspecified religious reasons. (*Id.* ¶ 42.) Finally, he claims that Defendants breached an implied contract in which they allegedly agreed to pay him for his sunglass designs. (*Id.* ¶¶ 108–11.)

Defendants dispute Plaintiff's arguments and assert that the sole reason for Plaintiff's termination was his mismanagement of the SoHo Store, including the rampant abuse of the company's discount code program by workers in the SoHo Store. (Doc. No. 8 ("Answer") at 12–15; Compl. Ex. B.) In addition, Defendants deny the existence of an implied contract and state that Plaintiff never designed sunglasses for them. (Answer at 13–14.) Finally, Defendants claim that Sunglass Hut Trading, LLC is not a proper defendant in this action because, once LRNA purchased Sunglass Hut in 2001, Sunglass Hut Trading, LLC ceased to have any authority or responsibility to hire, fire, or otherwise control employees at the SoHo Store. (*Id.* at 15.)

On August 8, 2014, Plaintiff voluntarily dismissed his FMLA claim. (Transcript of Court Proceedings, dated Aug. 8, 2014, at 14:5–9.) On September 19, 2014, Defendants filed a motion for summary judgment on all of Plaintiff's remaining causes of action (Doc. No. 31), along with a memorandum of law (Doc. No. 32 ("Mem.")), declarations in support of the motion (Doc. Nos. 34–38), and a Local Civil Rule 56.1 Statement (Doc. Nos. 33 ("Def. 56.1")). Although Plaintiff did not file a brief in opposition to Defendants' motion, on October 23, 2014, Plaintiff did file a Local Civil Rule 56.1 Statement, which, at the end of the document, included four pages of legal arguments that could arguably be viewed as an opposition to Defendants' motion for summary judgment. (Doc. No. 41 ("Pl. 56.1").)[1] On October 31, 2014, Defendants filed a reply memorandum of law. (Doc. No. 42 ("Reply").)

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts,

---

[1] Although Plaintiff submitted a Rule 56.1 Statement, most of that document fails to comply with Local Civil Rule 56.1 because it provides no citation to admissible evidence and fails to "specifically controvert" the factual assertions in Defendants' Rule 56.1 Statement. Accordingly, unless otherwise noted, where Defendants' 56.1 Statement is cited, Plaintiff does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73–74 (2d Cir. 2001) (noting that district courts are "free to disregard" assertions in 56.1 statements which do not comply with Local Civil Rule 56.1).

the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]," *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

The fact that a party fails to file an opposition to a motion for summary judgment "does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d. Cir. 1996). "Instead, the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Nevertheless, a plaintiff "cannot defeat a motion for summary judgment by simply relying on the allegations of his complaint; he must present admissible evidence from which a reasonable jury could find in his favor." *Belpasso v. Port Auth. of N.Y. & N.J.*, 400 F. App'x 600, 601 (2d Cir. 2010).

### III. DISCUSSION

#### A. Unlawful Discrimination Claims

Title VII, the NYSHRL, and the NYCHRL prohibit an employer from unlawfully discriminating against an employee because of an individual's race or religion, among other characteristics. *See* 42 U.S.C. § 2000e-2(a)(1); N.Y. Exec. L. § 296(1)(a); N.Y.C. Admin. Code § 8-107(1)(a). In addition, § 1981 "prohibits discrimination based on race in the making and enforcement of contracts," including employment contracts. *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998); *see also Tolbert v. Smith*, 790 F.3d 427, 436 (2d Cir. 2015) ("Refusing to award a contract or a material employment benefit for a discriminatory reason violates [§ 1981]."). Finally, the ADEA prohibits an employer from discriminating against or discharging an employee because of his age. *See* 29 U.S.C. § 623(a)(1).

To establish a claim for unlawful race, religious, or age discrimination under Title VII, § 1981, the ADEA, the NYSHRL, and the NYCHRL, a plaintiff must present either "direct evidence of discrimination" or less blatant evidence of discrimination that nevertheless satisfies the three-step burden-

3

shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See McGill v. Univ. of Rochester*, 600 F. App'x 789, 790 (2d Cir. 2015) (Title VII, § 1981, and NYSHRL); *Mingguo Cho v. City of New York*, 549 F. App'x 15, 17–18 (2d Cir. 2013) (ADEA); *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013) (NYCHRL). Direct evidence of discrimination is "a remark or action [that] directly reflects a discriminatory attitude." *Bookman v. Merrill Lynch*, No. 02-cv-1108 (RJS), 2009 WL 1360673, at *12 n.6 (S.D.N.Y. May 14, 2009); *see also Shao v. City Univ. of N.Y.*, No. 12-cv-1566 (RJS), 2014 WL 5038389, at *5 (S.D.N.Y. Sept. 30, 2014) ("The Second Circuit has noted that 'direct evidence' would roughly equate to a 'smoking gun' indicating that a plaintiff's firing was discriminatory.").

However, because direct evidence – or a "smoking gun . . . attesting to discriminatory intent" – is typically unavailable, plaintiffs often rely on the three-step *McDonnell Douglas* test. *Holtz*, 258 F.3d at 76. Under that standard, a plaintiff has the initial burden of establishing a prima facie case of discrimination by showing that (i) he belongs to a protected class, (ii) he was qualified for his position, (iii) he suffered an adverse employment action, and (iv) "circumstances surrounding that action giv[e] rise to an inference of discrimination." *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002). This initial prima facie burden has been characterized as "minimal" or "*de minimis*." *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005). If the plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate, through admissible evidence, "some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *see also Shao*, 2014 WL 5038389, at *4. Finally, if the defendant provides a nondiscriminatory reason for the adverse employment action, then, under Title VII, § 1981, and the NYSHRL, the plaintiff must present evidence either that "the employer's stated reason for the adverse employment action is entirely pretextual" or that unlawful discrimination was a "motivating factor" in the defendant's employment decision. *Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008). "To avoid summary judgment in an employment discrimination case, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Id.* at 138 (internal quotation marks omitted). In contrast, under the ADEA, a plaintiff at the third step must present evidence that "age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

Because the NYCHRL was intended to be broader than its federal and state analogues, courts addressing claims under that statute must analyze them independently, construing them "broadly in favor of . . . plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik*, 715 F.3d at 109–10 & n.8 (quoting *Albunio v. City of New York*, 947 N.E.2d 135 (2011)); *see also id.* at 109 ("Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards."). Accordingly, in addressing the NYCHRL claims, courts apply a modified *McDonnell Douglas* analysis in which, in the first step, a "plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason." *Id.*

at 110 n.8. Next, assuming the plaintiff carries his initial burden, the defendant must "present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination." *Id.* Finally, if the defendant satisfies the second step, the plaintiff must present evidence that "proves that unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for an adverse employment decision." *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 40 (App. Div. 1st Dep't 2012); *LeBlanc v. United Parcel Serv.*, No. 11-cv-6983 (KPF), 2014 WL 1407706, at *12 (S.D.N.Y. Apr. 11, 2014) (same).

1. Race Discrimination

In his race discrimination claims, Plaintiff argues that he was discriminated against and unlawfully discharged, not because of his own race, but because of his association with non-white employees. *See Holcomb*, 521 F.3d at 138 ("[A]n employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race."); *Kauffman v. Maxim Healthcare Servs., Inc.*, No. 04-cv-2869 (TCP), 2006 WL 1983196, at *4 (E.D.N.Y. July 13, 2006) (finding cognizable a white male plaintiff's Title VII claim that he was terminated because he hired women and minorities despite his employer's request that he hire only white men); *Chiara v. Town of New Castle*, 2 N.Y.S.3d 132, 140 (App. Div. 2d Dep't 2015) (finding cognizable an associational discrimination law claim under the NYSHRL). Specifically, Plaintiff claims he was fired because he refused to comply with Gidiuli's directive that he should hire only "white beautiful people." (Pl. 56.1 ¶ 8; Compl. ¶¶ 18, 30, 42.)

Although Plaintiff does not even argue this point, the Court first considers whether Gidiuli's statements constituted "direct evidence" of discriminatory intent. Plaintiff asserts that once between 2005 and 2007 and once between 2008 and 2010, Regional Manager Debbie Gidiuli – Plaintiff's supervisor from 2002 to 2006 and from August 2010 to July 2012 – told Plaintiff to "[h]ire white beautiful people." (Declaration of Craig R. Benson, dated Sept. 19, 2014, Doc. No. 34 ("Benson Decl."), Ex. A ("Pl. Dep.") at 59:18–60:12; 66:14–23; Def. 56.1 ¶ 10.) Around the same time, Plaintiff notes that Gidiuli told him that "there were too many Blacks and Hispanics" in the SoHo Store and that "[n]one of your staff members are quality people." (Pl. Dep. at 62:5–24; 75:4–21.) In addition, Plaintiff claims that, on recruiting trips, Gidiuli told him that she did not like the potential recruits, even the white recruits, because "they weren't white, all beautiful people." (*Id.* at 76:21–77:8.)

Clearly, Gidiuli's statements, if believed, would constitute strong evidence of Gidiuli's racial animus. However, that alone is not sufficient to constitute direct evidence of racial discrimination. Rather, Plaintiff must show that the racist remarks attributed to Gidiuli were linked, temporally and causally, to Plaintiff's firing. *See Crawford v. Dep't of Investigation*, 324 F. App'x 139, 142 (2d Cir. 2009) ("Comments can supply direct evidence of discrimination, but not without evidence connecting the remarks to the employment action at issue." (citation omitted)). Here, Plaintiff has failed to connect Gidiuli's stray remarks – made two to seven years *before* Plaintiff's termination by someone who was not involved in the firing decision – to the employment action at issue. *See Holowecki v. Fed. Exp. Corp.*, 382 F. App'x 42, 45, 45 n.1 (2d Cir. 2010) (noting that "stray remarks . . . or the remarks of non-decisionmakers" are

5

insufficient to constitute direct evidence of discrimination). Accordingly, the Court finds that Plaintiff has not presented "direct evidence" of discrimination and instead analyzes Plaintiff's claims under the three-step *McDonnell Douglas* approach.

With respect to step one of the *McDonnell Douglas* test – whether Plaintiff has established a prima facie case of discrimination – Defendants do not dispute that Plaintiff was qualified for his position or that his termination constituted an adverse employment action. Rather, Defendants assert that Plaintiff has failed to establish circumstances that give rise to an inference that Plaintiff was improperly terminated because of his association with non-white employees. The Court agrees, and finds that, even after drawing all reasonable inferences in favor of the Plaintiff, the comments attributed to Gidiuli still fail to raise an inference of associational race discrimination.

First, as previously stated, Gidiuli's comments were made two to seven years before Plaintiff was fired in October 2012. This time gap undermines any inference of discrimination because, as the Second Circuit has held, even a ten-month gap between an allegedly discriminatory comment and a subsequent termination is "too remote[] to support an inference that the adverse action was motivated by racial bias." *Howard v. City of New York*, 602 F. App'x 545, 547 (2d Cir. 2015); *see also Maqsood v. Bell Sec., Inc.*, 249 F. App'x 229, 230 (2d Cir. 2007) (finding that discriminatory comments made two years before plaintiff's termination were too remote to establish a prima facie case of discrimination).

Second, as previously noted, Plaintiff provides no evidence to suggest that the people who were actually involved in the decision to terminate Plaintiff made any of the alleged discriminatory comments. The law is clear that comments by someone who was not involved in the decisionmaking of the adverse employment action are insufficient to raise an inference of discrimination. *See Howard*, 602 F. App'x at 547 (finding that an individual's alleged discriminatory comment did not raise an inference of discrimination because that individual "had no decision-making authority in terminating" the plaintiff); *Stevens v. New York*, No. 09-cv-5237 (CM), 2011 WL 3055370, at *6 (S.D.N.Y. July 20, 2011) ("[W]here a supervisor has no input into a termination decision, that supervisor's beliefs, actions, and statements do not give rise to [an inference of discrimination]."). Here, Plaintiff alleges that Gidiuli and Chestman both made discriminatory comments toward him. However, at the time of Plaintiff's termination, Heather Flegal, not Gidiuli, was the Regional Manager of the SoHo Store, and, it is undisputed that it was Flegal, along with some of her supervisors, who made the decision to terminate Plaintiff. (Def. 56.1 ¶¶ 11, 45–46, 49.) Flegal, who Plaintiff noted in an employment questionnaire did a "wonderful job" as his supervisor and maintained an "awesome level of communication" (*id.* ¶ 12), neither consulted Gidiuli nor involved her in any way in the termination decision (*id.* ¶ 48). In fact, Gidiuli learned about Plaintiff's termination only after it occurred and did not know who had made the termination decision until her deposition in this case. (*Id.*) Accordingly, any discriminatory remarks made by Gidiuli cannot support an inference of a discriminatory discharge. *See Khan v. Abercrombie & Fitch, Inc.*, No. 01-cv-6163 (WHP), 2003 WL 22149527, at *7 (S.D.N.Y. Sept. 17, 2003) (noting that an individual "played no role in [the defendant's] decision to terminate [the

6

plaintiff], and therefore his statements, even if uttered, do not raise an inference of discrimination").

Plaintiff also claims that Chestman's single comment in 2010 that Plaintiff did not have any "quality people" in the SoHo Store raises an inference of discrimination. (Pl. Dep. at 96:9–21; 99:2–15; Pl. 56.1 Ex A 102:17–103:14.) However, even though Flegal "consulted with" Chestman in her decision to terminate Plaintiff (*see* Def. 56.1 ¶ 46), Chestman's solitary comment fails to raise an inference of discrimination because of the two-year time gap between Chestman's comment and Plaintiff's termination. In addition, Plaintiff himself admitted at his deposition that Chestman "never said anything that would indicate that" his comment "was referring to [employees'] race." (Pl. Dep. at 99:16–100:18.) As a result, even after drawing all reasonable inferences in favor of Plaintiff, Plaintiff has not established that Chestman's comment was discriminatory, much less related to Plaintiff's termination.

Finally, Plaintiff asserts that Defendants' discriminatory intent is demonstrated by the fact that Plaintiff was singled out for discipline even though other employees engaged in comparable conduct by improperly distributing the company's discount codes to customers. *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) (noting that disparate treatment can raise an inference of discrimination). However, Plaintiff has failed to demonstrate that "similarly situated" people were treated more favorably than he was. First, Marlene Betances, who was also accused of improperly giving customers employee discounts, was likewise fired for the conduct. (Def. 56.1 ¶ 50.) Second, while store employee Michael Womack, Jr., who was also accused of discount abuse, was not fired, Flegal explained that Womack had been working at LRNA for only two months prior to the incident and was instructed by his supervisor, Plaintiff, to use the improper discount code. (*Id.* ¶ 51.) Since Plaintiff was a Store Manager who had been employed by LRNA for nearly 17 years, a junior employee like Womack is not a proper comparator. *See Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("[T]he plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." (internal quotation marks omitted)); *Staff v. Pall Corp.*, 233 F. Supp. 2d 516, 535 (S.D.N.Y. 2002) (finding that the treatment of individuals, "neither of whom began working . . . at the same time as Plaintiff or had exactly the same positions or responsibilities as Plaintiff," could not be compared to that of the plaintiff), *aff'd*, 76 F. App'x 366 (2d Cir. 2003). In short, Plaintiff has failed to establish a prima facie case of discrimination by Plaintiffs.

In addition, even if Plaintiff could establish a prima facie case of discrimination, his claim would still fail under the third step of *McDonnell Douglas* because Plaintiff has not offered sufficient evidence to demonstrate that Defendants' legitimate, nondiscriminatory reason for firing him was pretextual or that unlawful discrimination was actually a motivating factor for his discharge. Here, Defendants present a clear story that demonstrates that Plaintiff was fired because of a pattern of discount abuse at the SoHo Store. Sometime in either August or September 2012, Plaintiff reported to Flegal that an employee had been giving customers invalid or outdated discount codes. (Def. 56.1 ¶ 34; Pl. 56.1 ¶ 18.) In response, Flegal contacted Asset Protection Regional Manager Kevin Baker, and together they decided to audit and visit the SoHo Store on September 27, 2012. (Def. 56.1 ¶ 36.) Through their

7

investigation, Baker and Flegal learned that Plaintiff had told employees that they could use a discount code to give customers a $20 discount on merchandise, even though LRNA had not authorized this discount. (*Id.* ¶ 38.) Indeed, one employee stated that Plaintiff told all employees to use the unauthorized discount code if a customer was "on the fence" about making a purchase. (*Id.* ¶ 40.) When asked about this improper practice, Plaintiff admitted that the discounts were not legitimate but failed to explain why he permitted employees to use them. (*Id.* ¶ 41.) Baker and Flegal also learned that store employee Betances improperly gave customer employee discounts by using Plaintiff's employee identification number to process sales for herself. (*Id.* ¶ 42.)[2]

As a result of this investigation, Baker and Flegal learned that unauthorized discounts had been used 115 times between August 1, 2012 and September 27, 2012 (*id.* ¶ 39), which resulted in the SoHo Store receiving an audit score of 53.49% – far below the 70% passing score (*id.* ¶ 44). Because of this pervasive discount abuse, both Baker and Flegal determined that Plaintiff should be fired. (*Id.* ¶¶ 45–46.) Specifically, Flegal stated that Plaintiff should be terminated because he had "acted dishonestly and violated Company policies by directing associates to use an unauthorized discount code and allowing another associate to use his personal employee identification number." (*Id.* ¶ 46.)[3] Flegal reported these findings to her supervisors, issued Plaintiff a Corrective Action Report ("CAR") – Plaintiff's third CAR in 2012 – that recommended his termination, and terminated him on October 16, 2012. (*Id.* ¶¶ 31–33, 46, 49; Compl. Ex. B.)

Plaintiff acknowledges that LRNA "strictly prohibits discount abuse" and that, as a Store Manager, he was responsible for preventing such abuse at his store. (Def. 56.1 ¶¶ 25–26.) Plaintiff also concedes that such a pattern of discount abuse would be a "legitimate, nondiscriminatory reason for termination." (*Id.*; *see also* Plaintiff's Letter to the Court, dated July 16, 2014, Doc. No. 27 ("Pl. Pre-Motion Letter"), at 3 ("The plaintiff concedes to the point that if there actually existed employee violation of the discount policy that it would be a legitimate and non-discriminating reason for termination.").) Plaintiff nevertheless argues that the discount abuse was a pretextual reason for his termination and that the true reason for his termination was his failure to adhere to Gidiuli's request that he hire "white beautiful people." However,

---

[2] Without providing citations to admissible evidence, Plaintiff states in his Rule 56.1 Statement that he was not "involved" in this transaction and that he was not "actively aware of which employee identification number was being used to process" the transaction. (Pl. 56.1 ¶ 15.) Even if the Court were to credit these statements – which do not satisfy the requirements of Local Civil Rule 56.1 – they do not undermine the inference that Plaintiff was aware that Betances was improperly using *someone's* employee identification number to give customers employee discounts.

[3] Plaintiff argues that inconsistencies in the testimony of Defendants' witnesses raise a genuine issue of material fact because "[i]t is unclear" whether Plaintiff was fired because employees used unauthorized coupons or because "the manner in which the coupons were used was unauthorized." (Pl. 56.1 ¶ 17.) However, Defendants' evidence clearly demonstrates that Plaintiff was fired because his store had a pattern of discount abuse in violation of LRNA's clear policies – which is obviously a legitimate, nondiscriminatory reason to terminate an employee. (*See, e.g.*, Def. 56.1 ¶¶ 25–26, 44.) *See also Lioi v. N.Y.C. Dep't of Health & Mental Hygiene*, 914 F. Supp. 2d 567, 587 (S.D.N.Y. 2012) (noting that the plaintiff's breach of company policy "is a neutral, legitimate justification for her termination").

8

Plaintiff once again fails to provide evidence that the SoHo Store's pattern of discount abuse was a pretextual reason for his termination or that unlawful discrimination was a motivating factor in his termination.

First, Plaintiff claims that "it was unreasonable to expect that he had the ability to monitor all transactions with regards to his store as they were occurring." (Pl. 56.1 ¶ 6.) However, even assuming this to be true, Plaintiff has failed to show how Defendants' demand for accountability – even if "unreasonable" – reflects any racial motivation. Put simply, Plaintiff has offered no reason to question Defendants' decision to terminate Plaintiff following his admitted failure to prevent 115 unauthorized transactions in the SoHo Store. *See Lioi*, 914 F. Supp. 2d at 587 ("[C]ourts have consistently held that they may not second-guess an employer's non-discriminatory business decisions, regardless of their wisdom, unless there is actual evidence that they were motivated by discrimination." (internal quotation marks omitted)).

Second, despite his assertion to the contrary, Plaintiff also fails to demonstrate that there was a company-wide policy of discrimination. In fact, it is undisputed that the SoHo Store was highly diverse and had employees of various racial and ethnic backgrounds. (*See* Def. 56.1 ¶ 3 (noting that, of the 65 employees at the SoHo Store from January 1, 2007 to August 19, 2013, there were 27 Hispanic or Latino employees, 12 Asian employees, 10 Black or African-American employees, and 16 White employees).) Plaintiff also acknowledges that he was never required to fire an employee because of his or her race. (*Id.* ¶ 67.)

In short, Plaintiff offers no evidence to suggest that Defendants' stated reasons for the termination were pretextual or that the real motivation was discriminatory. Therefore, Plaintiff's race-based unlawful discharge claims under Title VII, § 1981, and the NYSHRL fail.

For the same reasons, Plaintiff's unsupported, conclusory assertions about Defendants' alleged hiring policy also fail to satisfy the broader NYCHRL standard, which requires that race was one of the motivating factors in the decision to terminate him. Accordingly, the Court also grants Defendants' motion for summary judgment on the NYCHRL race discrimination claims. *See Melman*, 946 N.Y.S.2d at 44 (recognizing that, even under the broader NYCHRL, "not every plaintiff asserting a discrimination claim will be entitled to reach a jury," and granting summary judgment because "in response to [the defendant's] uncontroverted evidence of its nondiscriminatory reasons for [his employment action], plaintiff failed to come forward with evidence from which a jury reasonably could find that the challenged actions were motivated, either in whole or in part, by" a discriminatory reason).

### 2. Religious Discrimination

Plaintiff also claims that Defendants unlawfully discharged him on the basis of his unspecified religion and his desire to take Sundays off for religious reasons, in violation of Title VII, the NYSHRL, and the NYCHRL. To establish a prima facie case of discrimination based on religion, a plaintiff must show that he (1) "held a bona fide religious belief conflicting with an employment requirement; (2) informed [his] employers of this belief; and (3) [was] disciplined for [his] failure to comply with the conflicting employment requirement." *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006).

9

Here, Plaintiff has failed to offer any evidence in support of any of the elements of his prima facie case. First, Plaintiff has offered no evidence to demonstrate that he held a bona fide religious belief that conflicted with his work schedule. While Plaintiff once contacted LRNA's Associate Relations Call Center ("ARCC") on June 6, 2012 and asked for information about "religious accommodations," he declined to provide any details to the ARCC about his specific religion or the accommodations he was seeking. (Declaration of Myrna Murphy, dated Sept. 19, 2014, Doc. No. 38 ("Murphy Decl."), ¶ 18 & Ex. E.) Moreover, Gidiuli reported that Plaintiff initially *requested* that he be scheduled to work on Sundays to take inventory. (Def. 56.1 ¶ 72.)

Second, Plaintiff has offered no evidence to suggest that his supervisors were *aware* of his beliefs at the time of his termination. While Plaintiff once asked Gidiuli, prior to his departure in 2012, if he could take Sundays off to attend church, Plaintiff never raised this concern with Flegal once she became his supervisor. (*Id.*) As a result, Flegal – who ultimately made the decision to fire Plaintiff – could not act on Plaintiff's alleged request because she never knew about it. (*Id.*) Indeed, Flegal does not remember ever discussing religion or religious practice with Plaintiff. (*Id.*)

Furthermore, beyond alleging in a conclusory way in his Complaint that Defendants "intentionally sought to discriminate against the plaintiff on the basis of his religion by intentionally ceasing to accommodate plaintiff's religious practice and belief" (Compl. ¶ 42), Plaintiff offers no evidence demonstrating that Defendants denied his alleged request to take off Sundays or that he was disciplined for his failure to comply with a conflicting employment requirement. In fact, the only reference to religion in Plaintiff's deposition is that LRNA was "unfair against religion." (Pl. Dep. at 221:1–25.)[4] Accordingly, without more specific details demonstrating that, at the time of his termination, Plaintiff's supervisors were aware of his desire for religious accommodation and nevertheless refused to accommodate his request, the Court finds that Plaintiff has failed to raise facts that support an inference of discrimination under Title VII and the NYSHRL. *See Martinez v. Amalgamated Transit Union*, No. 03-cv-6291 (DGT), 2005 WL 1485246, at *4 (E.D.N.Y. June 23, 2005) ("[W]ithout a showing that an employer had knowledge that an employee is a member of a particular group, there can be no showing of discrimination.").

For the same reasons, Plaintiff has failed to meet the requirements of the "broader" NYCHRL statute. *See Haight v. NYU Langone Med. Ctr., Inc.*, No. 13-cv-04993 (LGS), 2014 WL 2933190, at *19 (S.D.N.Y. June 27, 2014) (granting motion to dismiss plaintiff's NYCHRL religious discrimination claims where she did not allege that she "was disciplined for failing to comply with employment requirements that conflicted with her religious beliefs"). Moreover, because Plaintiff has failed to provide *any* evidence of disparate treatment, he has also failed to demonstrate that LRNA treated him "less well" because of his unspecified religion. *See Shafer v. Am. Univ. in Cairo*, No. 12-cv-9439 (VEC),

---

[4] In his pre-motion letter to the Court, Plaintiff claimed that he sent an email to Flegal "complaining about being made to work on Sundays, despite the fact that he []is a devoted catholic and believes that he was committing [a] sin and would be punished by god for not keeping the Sabbath holy." (Pl. Pre-Motion Letter at 3.) However, Plaintiff's pre-motion letter and this alleged email are not a part of the record for purposes of this motion, and Plaintiff has offered no evidence to support this assertion in his Rule 56.1 Statement.

10

2014 WL 3767007, at *14 (S.D.N.Y. July 31, 2014) (granting summary judgment against Plaintiff as to her NYCHRL religious discrimination claims where she failed to produce any evidence that religious discrimination played any part in her discharge and where there is "ample evidence" that she was terminated for non-discriminatory reasons).

Finally, because Defendant has offered evidence of a non-discriminatory reason for Plaintiff's termination – namely, the rampant discount abuse at the SoHo Store – Plaintiff's failure to provide any evidence of religious discrimination to rebut this fact would be an additional basis for dismissing Plaintiff's religious discrimination claim. That is to say, even if Plaintiff could establish a prima facie case of religious discrimination – the first step of the *McDonnel Douglas* test – his claim would still fail given his failure to satisfy the third step of the *McDonnell Douglas* test. The Court therefore grants Defendants' motion for summary judgment on all of Plaintiff's religious discrimination claims.

### 3. Age Discrimination

Finally, Plaintiff alleges that Defendants discriminated against him and unlawfully discharged him because of his age, in violation of the ADEA, the NYSHRL, and the NYCHRL. However, Plaintiff once again has failed to establish a prima facie case of discrimination, even under the broader NYCHRL standard, because he has offered *no* evidence to demonstrate that he was treated less well because of his age. *See Mingguo Cho*, 549 F. App'x at 18 n.1 (affirming summary judgment on plaintiff's ADEA and related NYCHRL age discrimination claims because the plaintiff "failed to set forth *any* evidence supporting an inference of age discrimination . . . regardless of the standard applied").

First, although Plaintiff alleges in his Complaint that he was directed to hire "young, beautiful, white people" (*see* Compl. ¶ 30), Plaintiff has provided no *evidence* that Defendants made any discriminatory remarks related to his age or the age of his employees. His deposition testimony solely complains of being told to hire "white beautiful people." (*See, e.g.*, Pl. Dep. at 59:18–60:12; 66:14–23.) *See Nieves v. Angelo, Gordon & Co.*, No. 05-cv-7782 (NRB), 2007 WL 1098710, at *6 (S.D.N.Y. Apr. 10, 2007) (finding that plaintiff failed to state a prima facie case of age discrimination because "[t]here is not one scintilla of evidence in the record which tends to support plaintiff's theory that she was fired even in part because of her age"; "plaintiff does not allege that defendant made any reference whatsoever to plaintiff's age, either directly or indirectly, at any point during her over four years of employment at the company"), *aff'd*, 341 F. App'x 676 (2d Cir. 2009).

Second, Plaintiff has provided no evidence that he was treated differently from younger employees. Indeed, around the time of his termination, LRNA discharged at least two employees who were more than fifteen years younger than Plaintiff for the same pattern of discount abuse. (Def. 56.1 ¶¶ 50, 52.) For instance, Flegal fired Betances, who was 28 or 29 at the time of her termination, for improperly giving customers employee discounts. (*Id.*) Similarly, Flegal terminated at least one other employee for discount abuse who was eighteen years younger than Plaintiff. (Def. 56.1 ¶ 52; Murphy Decl. ¶ 28.) Accordingly, without any evidence that Defendants made discriminatory comments toward Plaintiff because of his age or evidence that Defendants treated younger employees differently, Plaintiff has failed to establish any facts that would support an inference of discrimination based on his age.

11

*See Heuser v. Metro. Transit Auth.*, No. 98-7810, 1999 WL 220144, at *1 (2d Cir. Apr. 13, 1999) ("The plaintiff's burden to establish a prima facie case of age discrimination is minimal, but speculative, conclusory allegations will not suffice to withstand a motion for summary judgment."). Therefore, the Court grants Defendants' motion for summary judgment on all of Plaintiff's age discrimination claims.

The Court also finds that, even if Plaintiff could establish a prima facie case of age discrimination, he has failed to show that Plaintiff's age was either a motivating factor or a but-for cause in Defendants' decision to terminate Plaintiff given the clear evidence of discount abuse at the SoHo Store presented by Defendants. *See Gross*, 557 U.S. at 180 (noting that, under the third step of the *McDonnell Douglas* test, a "plaintiff bringing a disparate-treatment claim pursuant to the ADEA [must] prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action"); *Colon v. Trump Int'l Hotel & Tower*, No. 10-cv-4794 (JGK), 2011 WL 6092299, at *5 (S.D.N.Y. Dec. 7, 2011) (applying the "but for" standard to NYSHRL age discrimination claims); *see also Weiss v. JPMorgan Chase & Co.*, No. 06-cv-4402 (DLC), 2010 WL 114248, at *1 (S.D.N.Y. Jan. 13, 2010) ("[T]he NYCHRL requires only that a plaintiff prove that age was 'a motivating factor' for an adverse employment action."). Accordingly, the Court grants Defendants' motion for summary judgment as to the age discrimination claims for the additional reason that Plaintiff has failed to meet his burden under the third step of the *McDonnell Douglas* test.

B. Retaliation Claims

Defendants also seek summary judgment on Plaintiff's claim that Defendants unlawfully retaliated against him for complaining about the company's pattern of racial discrimination. Title VII, § 1981, the NYSHRL, and the NYCHRL each prohibit employers from discriminating against employees in retaliation for engaging in a protected activity. *See* 42 U.S.C. § 2000e-3(a); N.Y. Exec. L. § 296(7); N.Y.C. Admin. Code. § 8-107(7); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (finding that § 1981 encompasses retaliation claims). Protected activities typically refer to "actions taken to protest or oppose statutorily prohibited discrimination," such as the filing of a formal complaint with the Equal Employment Opportunity Commission or making complaints to management about an activity that the employee reasonably believes violates the law. *Gioia v. Forbes Media LLC*, No. 09-cv-6114 (RJS), 2011 WL 4549607, at *10 (S.D.N.Y. Sept. 30, 2011), *aff'd*, 501 F. App'x 52 (2d Cir. 2012); *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *see also Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 313 (2004) (noting that, under the NYCHRL, protected activity includes any activity "opposing or complaining about unlawful discrimination").

Like unlawful discrimination claims, retaliation claims are analyzed under the *McDonnell Douglas* three-step burden-shifting approach, in which Title VII, § 1981, and the NYSHRL claims are analyzed together, while the NYCHRL claim is independently analyzed under a more liberal standard. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (Title VII and § 1981); *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361 (S.D.N.Y.

2012) (NYSHRL and NYCHRL). To assert a prima facie case for retaliation under Title VII, § 1981, and the NYSHRL, a plaintiff must establish that (1) he participated in a "protected activity," (2) "the defendant knew of the protected activity," (3) the employee suffered "an adverse employment action," and (4) there exists "a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (Title VII); *Fincher*, 604 F.3d at 720 (§ 1981); *Malena*, 886 F. Supp. 2d at 361–62 (NYSHRL). If the plaintiff meets this initial burden under Title VII, § 1981, and the NYSHRL, a presumption of retaliation arises and the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Hicks*, 593 F.3d at 164. Finally, if the defendant meets this burden, the plaintiff then has the burden of proving that "retaliation was a substantial reason for the adverse employment action." *Id.* A plaintiff can satisfy this burden by establishing that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause." *Id.*

Under the NYCHRL, to assert a prima facie case for retaliation, a plaintiff must show that: "(1) he participated in a protected activity; (2) the defendant knew about his participation; (3) the defendant took an employment action that disadvantaged the plaintiff *in any manner*; and (4) a causal connection existed between the protected activity and the negative employment action." *Fattoruso v. Hilton Grand Vacations Co.*, 525 F. App'x 26, 27 (2d Cir. 2013) (emphasis in original). If the plaintiff satisfies this initial burden and the defendant articulates a legitimate, non-retaliatory reason for the challenged action, the plaintiff has the burden of proving, by a preponderance of evidence, that the conduct was "reasonably likely to deter a person from engaging in protected activity." *Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S.2d 27, 34 (App. Div. 1st Dep't 2009).

Here, Plaintiff claims Defendants retaliated against him for complaining about Defendants' alleged illegal hiring practices by issuing him his first CAR in April 2012, denying his request to take paid overtime in June 2012, and wrongfully terminating him in October 2012. (Def. 56.1 ¶ 77; Pl. 56.1 ¶ 12; *see also* Compl. ¶¶ 21, 52, 76.) However, his claim must fail because, even under the broader NYCHRL standard, he has not established a prima facie case of retaliation.

First, even though Plaintiff called LRNA's ARCC to complain about Gidiuli, he failed to engage in any type of protected activity because, on those calls, Plaintiff did not complain of unlawful discrimination. (Def. 56.1 ¶¶ 54–57.) *See Mi-Kyung Cho v. Young Bin Café*, 42 F. Supp. 3d 495, 507 (S.D.N.Y. 2013) ("[C]omplaining of conduct other than unlawful discrimination . . . is simply not a protected activity subject to a retaliation claim." (internal quotation marks omitted)). For example, in May 2011, Plaintiff complained that Gidiuli did not inspire him, talked down to him, and rejected his request to take paid time off. (Def. 56.1 ¶ 53; Murphy Decl. Ex. A.) In addition, in April, June, and July of 2012, Plaintiff called the ARCC several times to complain that Gidiuli was always very negative and malicious and that Chestman had disrespected him during a visit to the SoHo Store. (Def. 56.1 ¶¶ 55, 60–61.) He also mentioned on one call that he had filled out a police report relating to "management's condescending behavior" and harassment, but, in that call, he never mentioned that the harassment was a result of unlawful discrimination. (*Id.* ¶ 56; Murphy Decl. Ex. B.) Furthermore, even though an ARCC representative labeled the notes of a call on June 5, 2015 with the term

13

"Discrimination," the actual notes contain no reference to unlawful discrimination and instead list general complaints about Gidiuli. (Def. 56.1 ¶ 60; Murphy Decl. Ex D (noting that Plaintiff complained that Gidiuli failed to give him sufficient guidance to complete an assignment).) In addition, Senior Human Resources Business Partner Myrna Murphy investigated each of these complaints, determined that they were without merit, and even reported some of the findings to Plaintiff, who was "satisfied that Murphy had investigated" the complaints. (*See, e.g.*, Def. 56.1 ¶¶ 53, 59, 61, 64.) Accordingly, the record before the Court merely reflects that these calls related to personal grievances that Plaintiff had with his supervisors, such as that they were condescending or rude. Therefore, Plaintiff's complaints do not rise to the level of protected activity. *See Martinez v. N.Y.C. Dep't of Educ.*, No. 04-cv-2728 (LTS) (DFE), 2008 WL 2220638, at *11 (S.D.N.Y. May 27, 2008) (noting that complaining of "allegedly unfair treatment from [an employer] on the basis of personal animosity" is not protected activity); *Satterfield v. United Parcel Serv., Inc.*, No. 00-cv-7190 (MHD), 2003 WL 22251314, at *12 (S.D.N.Y. Sept. 30, 2003) ("[P]ersonality conflicts are beyond the purview of Title VII."); *see also Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (noting that "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity" because they do not put an employer on notice of discrimination).

In fact, the only evidence that Plaintiff has offered to demonstrate that he engaged in protected activity is his deposition testimony that, in January or February of 2011, he *thinks* he called the ARCC because Gidiuli told him to "hire white beautiful people." (Pl. Dep. at 110:7–18.) Given the equivocal nature of this recollection and the fact that Plaintiff has offered no independent evidence of this call, the Court cannot conclude that Plaintiff engaged in protected activity for purposes of his retaliation claims. Moreover, even assuming that Plaintiff made such a call, he cannot establish a prima facie case of discrimination based on this call, since the time gap between this call and Defendants' alleged adverse employment action undermines any causal connection between the protected activity and the retaliation. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (finding that temporal proximity between protected activity and alleged retaliation must be "very close" to establish a prima facie case of retaliation and that even a three-month gap is insufficient). Specifically, Plaintiff's call in February 2011 occurred over a year before Plaintiff received his first CAR in April 2012, was denied paid time off in June 2012, or was terminated in October 2012. A time gap of over a year is not close in proximity and is insufficient to create the causal connection necessary to establish a prima facie case of discrimination. *See, e.g.*, *Smiley v. Cassano*, No. 10-cv-3866 (RJS), 2012 WL 967436, at *8 (S.D.N.Y. Mar. 21, 2012) ("[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation."); *Bluight v. Consol. Edison Co. of N.Y.*, No. 00-cv-3309 (GEL), 2002 WL 188349, at *6 n.8 (S.D.N.Y. Feb. 6, 2002) (finding that a time gap of almost a year is "not even very close in time" and is insufficient to establish a causal connection). Accordingly, Plaintiff has failed to state a prima facie case of retaliation.

Similarly, even if Plaintiff had established a prima facie case of retaliation,

14

the Court would still grant Defendants' motion for the additional reason that Plaintiff has offered no evidence to rebut Defendants' showing that he was terminated for a non-retaliatory reason, namely, because of the rampant discount abuse at the SoHo Store.

### C. Hostile Work Environment Claim

Defendants also seek summary judgment on Plaintiff's hostile work environment claim. In his Complaint, Plaintiff alleges that Defendants "created and subjected Plaintiff to a hostile work environment on the basis of his race." (Compl. ¶ 57.) Aside from two vague assertions that he was "ridicule[d]" and "criticized for not having suitable employees" (Pl. 56.1 ¶¶ 8, 12), Plaintiff has failed to specifically address his hostile work environment claim in his submissions to the Court. As a result, Defendants argue that Plaintiff has abandoned his claim. *See Fincher*, 604 F.3d at 723 (noting that plaintiff's failure to make "any argument touching on" a specific claim in an opposition to summary judgment constitutes abandonment of the claim); *Shao*, 2014 WL 5038389, at *9–11 (same). The Court need not address this argument because, even if the slim evidence that Plaintiff has offered in opposition is sufficient to show that he has not abandoned his claim, he has failed to demonstrate a genuine issue of material fact that would warrant denial of summary judgment.

To assert a hostile work environment claim under Title VII, the plaintiff must show that: (1) "the discriminatory harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," (2) "a specific basis exists for imputing the objectionable conduct to the employer," and (3) "the hostile conduct occurred because of a protected characteristic." *Tolbert*, 790 F.3d at 439 (internal quotation marks omitted). When evaluating a hostile work environment claim, a court must consider "the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's work performance." *Williams v. Cty. of Westchester*, 171 F.3d 98, 100 (2d Cir. 1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Although very serious isolated acts may meet the threshold of severity and pervasiveness, "[a]s a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted); *Williams*, 171 F.3d at 100–01 (noting that a plaintiff must show "a steady barrage of opprobrious racial comments," rather than "a few isolated instances of racial enmity").

Here, Plaintiff asserts in a conclusory way that he was "criticized" for not following Gidiuli's allegedly race-based hiring practices. (Pl. 56.1 ¶ 8.) However, other than mentioning that Gidiuli told him to hire "white beautiful people" and that Chestman once told him that the employees at his store were not "quality people," Plaintiff has not offered any evidence to suggest that these or other comments made toward him were "physically threatening or humiliating." *See Castro v. Local 1199*, 964 F. Supp. 719, 727–28 (S.D.N.Y. 1997) (noting that the plaintiff, a Hispanic woman who offered evidence of one racially discriminatory remark and claimed that her supervisor "manifested an obvious dislike of Hispanics," failed to sustain a hostile work environment claim on summary judgment

15

because she failed to provide evidence of pervasive discriminatory conduct).

Furthermore, while Plaintiff recalls one incident, more than 10 years ago, when Chestman yelled at him in front of customers because Plaintiff had not removed the glass doors on certain display cases (Pl. 56.1 Ex. A at 103:8–104:20), this isolated event is clearly insufficient to demonstrate an abusive work environment – particularly since Plaintiff does not allege that he was yelled at because of his race, age, religion, or membership in any other protected category. *See Alfano*, 294 F.3d at 377 (noting that courts must be vigilant "in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination," since "[o]therwise, the federal courts will become a court of personnel appeals"). Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiff's hostile work environment claim.

### D. Common Law Claims

Defendants also seek summary judgment on Plaintiff's state law claims for intentional infliction of emotional distress, negligent hiring, and breach of contract. For the reasons set forth below, the Court also grants Defendants' motion with respect to these claims.[5]

### 1. Intentional Infliction of Emotional Distress

To assert a claim for intentional infliction of emotional distress under New York law, a plaintiff must prove the following four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co.,* 596 N.Y.S.2d 350, 353 (1993). To demonstrate extreme and outrageous conduct, a plaintiff must show conduct that is "so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. Am. Home Prods. Corp.,* 461 N.Y.S.2d 232, 236 (1983); *see also Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d. Cir. 1985) ("New York courts have been very strict in applying these principles."); *Hirschheimer v. Associated Metals & Minerals Corp.*, No. 94-cv-6155 JFK, 1997 WL 528057, at *6 (S.D.N.Y. Aug. 27, 1997) ("[T]his standard is so strict that even overt acts of discrimination have generally not been found to rise to such a level." (internal quotation marks omitted)).

Here, the Complaint conclusorily alleges that Gidiuli, Murphy, and Chestman "continually and intentionally engaged in outrageous conduct inflicting severe emotional distress on Plaintiff." (Compl. ¶¶ 93–98.) However, Plaintiff has offered no evidence of such extreme or outrageous conduct, as required under New York law. Moreover, even assuming that Plaintiff properly established a claim for wrongful termination based on unlawful discrimination or retaliation, which the Court has already found he has not, the unlawful firing of an employee, without

---

[5] Once again, Defendants argue that Plaintiff has abandoned his intentional infliction of emotional distress and negligent hiring claims because he failed to file an opposition brief or specifically address these claims in his Rule 56.1 Statement. (Reply at 8–9.) However, as with Plaintiff's hostile work environment claim, the Court finds that summary judgment is warranted in any event, so the Court need not address the issue of abandonment.

16

more, cannot form the basis of an intentional infliction of emotional distress claim. *See, e.g.*, *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303, 306–07 (1983) (dismissing plaintiff's intentional inflicting of emotional distress claim based on plaintiff's alleged wrongful discharge, while permitting his age discrimination claim to proceed); *Stella Stylianou v. St. Luke's/Roosevelt Hosp. Ctr.*, 902 F. Supp. 54, 59 (S.D.N.Y. 1995) ("Even accepting as true for the purposes of this motion all of the plaintiff's [wrongful discharge claims based on age discrimination], the actions by plaintiff's supervisors fell far short of the extreme and outrageous behavior standard."); *Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667, 681 (S.D.N.Y. 1995) (same). Therefore, because Plaintiff has failed to establish that Defendants engaged in extreme or outrageous conduct, the Court grants summary judgment to Defendants on Plaintiff's intentional infliction of emotional distress claim.

### 2. Negligent Hiring, Retention, and Supervision

Plaintiff vaguely claims that Defendants engaged in negligent hiring, retention, and supervision by placing its employees "in a position to cause foreseeable harm . . . which the Plaintiff most probably would have been spared had Defendants taken reasonable care in making its decision concerning the hiring and retention of the employee[s]." (Compl. ¶¶ 104–06.) This claim must fail for two reasons. First, Plaintiff has offered no evidence to support or explain the conclusory allegations in his Complaint. Second, under New York law, the exclusive remedy for an employee who is injured by the negligence or wrong of another employee is New York's Workers' Compensation Law. *See Gerris v. Delta Air Lines, Inc.*, 277 F. 3d 128, 138 (2d Cir. 2001) (finding that negligent hiring claims are "precluded by the exclusive remedy provisions of New York's Workers' Compensation statute"); *Pellei v. Int'l Planned Parenthood Fed'n/W. Hemisphere Region, Inc.*, No. 96-cv-7014 (WHP), 1999 WL 787753, at *13 (S.D.N.Y. Sept. 30, 1999) (finding that plaintiff may not bring a negligent supervision claim against her employer on the theory that her immediate supervisors or co-employees discriminated against her because such a claim is barred by the New York Worker's Compensation statute). Accordingly, Plaintiff's claim for negligent hiring must be dismissed.

### 3. Breach of Implied Contract

Finally, Plaintiff alleges that Defendants "breached [an] implied contract with plaintiff, when [they] failed to compensate plaintiff for sunglasses that were designed by plaintiff." (Compl. ¶ 109; Pl. 56.1 ¶ 26.) Under New York law, "an implied contractual relationship may be established by conduct of the parties, as well as by express agreement." *Mirchel v. RMJ Sec. Corp.*, 613 N.Y.S.2d 876, 879 (1994). Nevertheless, as with an express contract, the law requires that there be "a meeting of the minds as to the material terms" of an implied contract. *Metro. Enters. N.Y. v. Khan Enter. Constr., Inc.*, 1 N.Y.S.3d 328, 329 (App. Div. 2d Dep't 2015); *Millenium Expressions, Inc. v. Chauss Mktg., Ltd.*, No. 02-cv-7545 (JCF), 2007 WL 950070, at *5 (S.D.N.Y. Mar. 30, 2007) ("As with an express contract, the key element of a contract implied in fact is that there be mutual agreement between the parties."). Accordingly, a "mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) (quoting *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981)).

Here, Plaintiff acknowledges that there was no express agreement in which LRNA agreed to pay Plaintiff for his sunglass designs. (Def. 56.1 ¶ 82.) He nevertheless claims that, in 2002 or 2003, Gidiuli created an implied contract when she told him that he could be paid for designing sunglasses once LRNA determined how it could compensate him. (Def. 56.1 ¶ 83.) Plaintiff further claims that he "designed" sunglasses by taking photographs of or buying sunglasses that he thought LRNA could "copy." (Pl. Dep. at 197:14–202:4.)

However, Plaintiff has presented no evidence to establish a meeting of the minds between himself and Defendants with respect to the material terms of the alleged contract. First, there is no evidence to suggest that the parties *agreed* that Plaintiff could "design" sunglasses merely by taking photographs or buying other sunglasses. Indeed, Dan Nowlin, President of Sunglass Hut Culture, testified that Plaintiff never designed sunglasses for LRNA, despite the fact that, on one occasion, Plaintiff "brought in maybe four or five frames that he had acquired outside of Luxottica, I assume, and said, look at these." (Benson Decl. Ex E (Deposition of Dan Nowlin, dated May 21, 2014, Doc. No. 40 Ex. 8, at 17:11–16.)

More importantly, even if these photographs and purchases constituted "designs" under the alleged contract, Plaintiff has failed to demonstrate the existence of a contract because it is undisputed that there was no meeting of the minds as to Plaintiff's compensation, another key material term. Under New York law, "price is an essential ingredient of every contract for the rendering of services," such that "an agreement must be definite as to compensation." *Cooper Square Realty, Inc. v. A.R.S. Mgmt., Ltd.*, 581 N.Y.S.2d 50, 51 (App. Div. 1st Dep't 1992). To be sure, "a price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (1989). "Where at the time of agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties," such as where the compensation might "be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage." *Id.* (finding that a price term "was sufficiently definite for an enforceable contract" because the contract "manifests the parties' unmistakable intent that price was to be fixed by a third person – the Department of Health" – and therefore, the contract provided an "objective standard" of price "without the need for further expressions by the parties").

Here, Plaintiff's claim for breach of implied contract fails because it is undisputed that the parties never agreed about how to compensate Plaintiff for his "designs." While Plaintiff claims that he was promised compensation through a "raise in my check, traveling expenses all paid, hotel paid, private events I was invited to, [and] free eyewear," he admits the parties never reached an agreement about his compensation. (*See* Pl. Dep. at 197:14–23; 204:9–14 (noting that no one at LRNA ever made a "specific commitment" as to his compensation).) As a result, during the eight to ten years in which Plaintiff claims that he "designed eyewear" for LRNA, he was never once compensated for his "designs." (*Id.* at 197:3–6.) Without evidence of a key material term of this supposed promise or that the term could be determined objectively without an additional expression by the parties, Plaintiff has failed to identify an enforceable contract. *See*

*Major League Baseball Props., Inc. v. Opening Day Prods.*, Inc., 385 F. Supp. 2d 256, 271–72 (S.D.N.Y. 2005) (finding that there was no meeting of the minds as to compensation and, therefore, no enforceable contract because, even though the parties expected that a future agreement would "spell out such compensation," they never agreed on the defendant's pay); *see also Hudson & Broad, Inc. v. J.C. Penney Corp.*, No. 12-cv-3239 (KBF), 2013 WL 3203742, at *3 (S.D.N.Y. June 18, 2013) (noting that "a contract will not be found to have been formed if it is not reasonably certain in its material terms," and the plaintiff "cannot point to sufficient specific, concrete, factual representations such that they could be interpreted to supply the terms of an implied contract"), *aff'd*, 553 F. App'x 37 (2d Cir. 2014); *Cooper Square Realty*, 581 N.Y.S.2d at 51 (finding there was no enforceable contract because the parties neither had a "definite" agreement on compensation nor provided an "objective method or formula" for determining compensation).

Therefore, because Plaintiff has failed to provide any evidence of an enforceable contract, the Court grants Defendants' motion for summary judgment on Plaintiff's breach of implied contract claim.

## IV. Conclusion

For the reasons stated above, the Court finds that there is no genuine dispute as to any material fact and that Defendants are entitled to judgment as a matter of law on each of the claims asserted by Plaintiff.[6] Accordingly, IT IS HEREBY ORDERED THAT Defendants' motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion located at docket number 31 and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 28, 2015
New York, New York

\*   \*   \*

Plaintiff Pavolo Venezia is represented by Courtney Kirk-Patrick Davy of Law Office of Kenneth Rameur, 299 Broadway, New York, New York 10007.

Defendants are represented by Craig Robert Benson and Hema Chatlani of Littler Mendelson, P.C., 900 Third Avenue, 7th Floor, New York, NY 10022.

---

[6] Because the Court has granted summary judgment on all of Plaintiff's claims in this action, the Court need not address Defendant Sunglass Hut Trading, LLC's separate argument that it is not a proper party in this action.